UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

NICHOLAS MICHALAKIS,

                    *Plaintiff*,

                                        <u>**MEMORANDUM AND ORDER**</u>

     -against-                          21-CV-2697 (KAM)


MARTIN O'MALLEY, Commissioner of Social
Security,

                    *Defendant*.

-------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

     Plaintiff Nicholas Michalakis ("Plaintiff") appeals the final decision of the Commissioner of Social Security (the "Commissioner")[1], finding him not disabled from April 1, 2011, through December 31, 2016, and thus not entitled to disability insurance benefits under Title II of the Social Security Act (the "Act").   Plaintiff and the Commissioner have cross-moved for judgment on the pleadings.   For the reasons herein, Plaintiff's motion is respectfully **DENIED**, and the Commissioner's motion is **GRANTED**.

_____

[1] The Court has updated the caption to reflect the new Commissioner of Social Security, who took office after Plaintiff commenced this action. *See* Fed. R. Civ. P. 25(d); *Pryor v. Berryhill*, 286 F. Supp. 3d 471 n.1 (E.D.N.Y. 2017).

1

**BACKGROUND**

I.  **Procedural History**

On February 17, 2012, Plaintiff filed an initial claim for disability insurance benefits ("DIB") alleging a variety of disabling injuries and conditions, including: blockage of cardiac arteries requiring stents, bulging discs in his lower back, and associated pain and symptoms.  (ECF No. 7, Administrative Transcript ("Tr."), at 65, 152-60.)  Plaintiff's claim was denied by the Social Security Administration ("SSA") on April 13, 2012, and he thereafter requested a hearing before an Administrative Law Judge.  (*Id.* at 69-79.)

On January 28, 2013, plaintiff appeared before ALJ April M. Wexler (the "ALJ"), (*Id.* at 41), who denied Plaintiff's claim in a written decision dated February 7, 2013.  (*Id.* at 24-40.) Plaintiff requested Appeals Council review of the decision on March 5, 2013.  (*Id.* at 5-23.)  On April 14, 2014, the Appeals Council denied Plaintiff's request, and Plaintiff subsequently appealed the final decision to this Court on June 16, 2014.  (*Id.* at 1-4.) This Court remanded Plaintiff's case for further proceedings, finding that the ALJ "failed to apply the proper standard for evaluating the medical opinion of plaintiff's treating orthopedic physician" and failed to properly evaluate the credibility of Plaintiff's statements about the severity and limiting nature of

2

his symptoms. *Michalakis v. Colvin,* No. 14-CV-3753 (KAM), ECF No. 22, at 44, 59 (E.D.N.Y. Dec. 28, 2016).

After the Appeals Council remanded his case to the ALJ for further proceedings, Plaintiff appeared before the ALJ for a new hearing on November 20, 2017. (Tr. at 644-46, 538.) Plaintiff was represented by counsel and Vocational Expert Victor Alberigi (the "VE") testified. (*Id.* at 538.) In a written decision dated December 22, 2017, the ALJ found Plaintiff not disabled. (*Id.* at 426-42.) Plaintiff requested review by the Appeals Council on January 5, 2018, and the Appeals Council declined to review the decision by action dated March 10, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 419-24, 704.) This action followed. (*See generally* ECF No. 1, Complaint.)

## II. **Hearing before the ALJ**

Plaintiff was represented by attorney Nicholas Cifuni at his most recent November 20, 2017, hearing before the ALJ. (Tr. at 538.)

The Court will briefly examine the events leading up to Plaintiff's initial application for disability. Plaintiff was born on April 5, 1968, and was 42 years old at the time of the alleged disability onset, April 1, 2011. (*Id.* at 65, 152-60). Plaintiff worked as a police officer in the New York City Police Department ("NYPD") from October 1990 through April 2011. (*Id.* at 154.) On April 29, 2011, Plaintiff submitted an application for

disability retirement from the NYPD based on symptoms of heart disease which required cardiac catheterization. (*Id.* at 304-06.) Plaintiff's application for Accident Disability Retirement was approved on August 30, 2011, with a final diagnosis of "Coronary Artery Disease Status Post Two-Stent Placement." (*Id.*) At the time of his retirement, Plaintiff held the position of police lieutenant. (*Id.*)

At the hearing before the ALJ in 2020, Plaintiff described his work prior to his medical retirement. (*Id.* at 544.) Plaintiff described his work as a police lieutenant as "[m]ore desk supervisory" as he worked in an office in the Bronx Criminal Court supervising "the arraignment section, the courtrooms, the lodgings in central booking." (*Id.*) Plaintiff described his previous work as a police sergeant as being a combination of administrative work and patrol work. (*Id.* at 545.) The ALJ asked Plaintiff whether the heart condition that resulted in his medical retirement continued to be an issue that "stops [him] from being able to work" and Plaintiff responded that it did not. (*Id.* at 546.) As a result, the ALJ moved to examine Plaintiff's orthopedic complaints. (*Id.*)

The ALJ questioned Plaintiff regarding his orthopedic treatment between August 2014 though early 2017, given a lack of evidence from the treating physician during that time period. (*Id.* at 547.) Plaintiff stated that he had not received treatment, but

had seen a chiropractor and worked on stretching with his sister, a yoga instructor. (*Id.*) Plaintiff testified that he took no medication for his claimed orthopedic impairments during that time. (*Id.* at 548.) Plaintiff also testified regarding experiences of dizziness between his alleged onset date and prior to December 31, 2016, his date last insured. (*Id.* at 550.) Plaintiff stated that he had fallen twice because of dizziness – once in 2013, and once in June of 2017. (*Id.* at 552.)

Plaintiff also testified as to his activities of daily living between April 2011 and December 31, 2016. (*Id.* at 554.) Plaintiff testified that he drove to physical therapy and doctor's appointments, and that he would occasionally drive to take care of errands such as visiting the post office. (*Id.* at 556-57.) Plaintiff also stated that he traveled to see family, and took two trips to Florida. (*Id.* at 557.) Plaintiff explained that he traveled in a car with his wife who drove to Florida for one trip, and flew for the other, in part to look for houses to buy. (*Id.*) Plaintiff also stated that he took the train to attend a New York Rangers game at Madison Square Garden during the relevant period. (*Id.* at 558.) Plaintiff stated that he did not do any chores around the house or do any cooking, but he could make himself a "sandwich now and then." (*Id.* at 559.) Plaintiff also testified that "at times" his wife had to assist him with dressing and cutting his food. (*Id.* at 560.)

Plaintiff's attorney examined Plaintiff during the hearing and primarily asked about his treatment with Dr. Goldstein, his orthopedic provider. (*Id.* at 561-66.) Plaintiff testified that he stopped seeing his orthopedic provider from 2014 to 2017 because "[his] condition was the same . . . it hadn't improved, but it hadn't gotten worse." (*Id.* at 565.)

The ALJ called the VE as a witness at the hearing, as well. (*Id.* at 566.) The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and work experience who could "sit for up to six hours, stand and walk for three hours each in an eight-hour day; can lift and carry 20 pounds occasionally and 10 pounds frequently; can never be exposed to unprotected heights or moving mechanical parts or vibrations; occasional exposure to dust, odors, fumes, pulmonary irritants, humidity, wetness, extreme heat and cold; occasional operation of foot controls; occasionally climbing ramps and stairs, ladders and scaffolds; occasionally kneeling and crouching and never crawling" and whether such an individual could perform Plaintiff's past work. (*Id.* at 570.) The VE concluded that such a person could perform Plaintiff's prior work as a police lieutenant and sergeant, but not as a patrol officer. (*Id.* at 566-70.) The VE also testified that such a person could perform the jobs of police aide, clerical assistant, and customer service representative. (*Id.* at 570.) The ALJ subsequently added additional constraints to the

6

hypothetical individual, including an inability to stand and walk or sit for more than two hours, and the VE clarified that such an individual could not perform any jobs in the national economy. (*Id.* at 572.)   Upon questioning from Plaintiff's counsel, the VE further clarified that a limitation to overhead reaching would not impact an individual's ability to perform the jobs described.  (*Id.* at 573.)

## III. The ALJ's Decision

Pursuant to the SSA regulations, an ALJ follows a five-step process for evaluating disability claims, which has been summarized as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits h[er] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider h[er] [*per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform h[er] past work. Finally, if the claimant is unable to perform h[er] past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)). "The applicant bears the burden of proof in the first four steps

of the sequential inquiry; the Commissioner bears the burden in the last." *Id.* To determine the claimant's residual functional capacity ("RFC"), the ALJ must consider the claimant's "impairment(s), and any related symptoms, [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

In the instant case, the ALJ denied Plaintiff's application for disability benefits on December 22, 2017. (Tr. at 426.) Following the five-step test set forth in SSA regulations, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of April 1, 2011, through his date last insured of December 31, 2016. (*Id.* at 432.) At step two, the ALJ found that Plaintiff had the following "severe impairments": a herniated disc at L5-Sl, internal derangement of the cervical spine, coronary artery disease status post angioplasty and stenting, diabetes mellitus, and vertigo. (*Id.*)

At step three, the ALJ concluded that none of Plaintiff's severe impairments singly or in combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ considered Listing 1.04 (regarding Plaintiff's spine impairments) but concluded that Plaintiff did not meet or equal the stated criteria. (*Id.* at 433.) Specifically, the ALJ found that Plaintiff's asserted impairments

8

were not accompanied by evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication, for Listing 1.04.  (*Id.*)

The ALJ next assessed Plaintiff's RFC.  (*Id.*)  The ALJ found that Plaintiff could perform light work as defined in 20 C.F.R. § 404.1567(b) except Plaintiff could, in an 8-hour day, (1) sit up to 6 hours, (2) stand and walk for three hours, (3) lift and carry up to 10 pounds frequently and 20 pounds occasionally, (4) never crawl, and only occasionally operate foot controls, climb stairs, ramps, ladders, or scaffolds, and kneel and crouch, (5) could never be exposed to unprotected heights, moving mechanical parts or vibrations, and (6) could only tolerate occasional exposure to humidity, wetness, temperature extremes, and dust, odors, fumes, and pulmonary irritants.  (*Id.*)

Regarding Plaintiff's physical impairments, the ALJ credited Plaintiff's claims of dizziness, medication-caused fatigue, and back pain, but found that the available evidence did not support his subjective claims as to the intensity, persistence, and limiting effects of his symptoms.  (*Id.* at 433-34.)  For instance, the ALJ noted that records from Plaintiff's treatment showed "intact sensation in all distributions . . . radicular symptoms were not present . . . no nerve root impingement," and "no evidence of peripheral radicular or entrapment neuropathies."  (*Id.* at 434.)  The ALJ also noted that there was "no documentary evidence that

[Plaintiff] sought or received any further treatment for his spine impairments [between August 2014 and] March 2017." (*Id.*) Ultimately, the ALJ concluded that "the evidence establishes that [Plaintiff] retains the capacity to function adequately to perform many basic activities associated with work" and that the RFC "accounts for [Plaintiff's] testimony supported by medical evidence of record." (*Id.* at 440.)

In reaching her RFC conclusion as to Plaintiff's physical abilities, the ALJ evaluated the opinions of the various treating physicians and considered opinion evidence as to Plaintiff's functional capacities. (*Id.* at 434-440.)

First, the ALJ accorded "no significant weight" to the opinions of Drs. Mitchell Goldstein and Michael Hearns. (*Id.* at 435.)   Dr. Goldstein provided a check-box medical opinion on December 14, 2012, opining that Plaintiff is "Totally Disabled and unable to perform all aspects of work," citing a back x-ray and MRI along with physical examination findings. (*Id.* at 310-11.) Dr. Goldstein subsequently drafted a letter to Plaintiff's attorneys offering a "narrative report" opining that Plaintiff "remains permanently and totally disabled" dated January 7, 2013. (*Id.* at 350-52.)   Dr. Hearns opined in a January 3, 2013, letter to Plaintiff's attorneys that "[Plaintiff] is unfit to perform any competitive job within the US job market." (*Id.* at 347-48.)   The ALJ found that the two physicians' opinions were "not supported by

10

the record" including the "very conservative treatment" Plaintiff received as well as the fact that "examination findings were mild, including intact strength in all extremities, normal reflexes, and normal sensation." (*Id.* at 435.)  The ALJ also noted the lack of any orthopedic treatment whatsoever between August 2014 and March 2017.  (*Id.*)  A subsequent opinion by Dr. Goldstein with similar findings dated August 2017 was also given "less weight" by the ALJ given the gap in treatment and the fact that it appeared "to have been based primarily on the medical record after the expiration of [Plaintiff's] disability insured status [on December 31, 2016.]" (*Id.* at 437.)

Second, the ALJ gave "good weight" to the August 2017 opinions of Drs. Peter Schosheim, an orthopedic surgeon, and Dr. Gerald Galst, a cardiovascular specialist, whose opinions were based on a review of the record, and not an individual examination.  (*Id.* at 436-40.)  The ALJ noted that each physician had the chance to review "the available medical record" and was a specialist in their respective field.  (*Id.*)

Third, the ALJ gave "some weight" to the opinion of consultative examiner Dr. Linell Skeene.  (*Id.* at 440.)  Dr. Skeene opined that Plaintiff had a "moderate limitation for prolonged standing, walking, and heavy lifting due to limited [range of motion] of the lumbar spine." (*Id.* at 290.)  The ALJ noted that Dr. Skeene examined Plaintiff only once, and the opinion was

somewhat vague, as reasons for assigning the opinion less weight. (*Id.* at 440.)

At step four, the ALJ found that Plaintiff was "capable of performing past relevant work as a police sergeant and police lieutenant" as the work "did not require the performance of work-related activities precluded by [Plaintiff's RFC]." (*Id.* at 441.) Although the finding that Plaintiff had the RFC to perform his past relevant work was sufficient to end the inquiry, the ALJ nonetheless noted that the VE found that "an individual with the same medical vocational profile as [Plaintiff]" could perform work as a police aide, clerical assistant, or customer service representative. (*Id.*) The ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (*Id.*)

## STANDARD OF REVIEW

To receive disability benefits, a claimant must be "disabled" within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). A claimant qualifies as disabled when he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The impairment must be of "such severity" that the claimant is unable to do his previous work or "engage in any other kind of substantial gainful work." *Id.* § 423(d)(2)(A). "The

Commissioner must consider the following in determining a claimant's entitlement to benefits: '(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability . . . ; and (4) the claimant's educational background, age, and work experience.'" *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (alterations in original)).

An unsuccessful claimant for disability benefits under the Act may bring an action in federal court seeking judicial review of the Commissioner's denial of his or her benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the reviewing court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (internal quotation marks omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether the Commissioner's findings were based on substantial evidence, "the reviewing court is required to examine the entire record, including contradictory

evidence and evidence from which conflicting inferences can be drawn." *Id.* However, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (*per curiam*).

Federal law explicitly authorizes a court, when reviewing decisions of the SSA, to order further proceedings when appropriate. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (internal quotation marks omitted). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. *Pratts*, 94 F.3d at 39. If, however, the record before the court provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the

14

calculation and payment of benefits.  *See, e.g.*, *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

**DISCUSSION**

On appeal, Plaintiff asserts that the ALJ: (1) improperly rejected Dr. Goldstein's medical opinion; and (2) improperly determined that Plaintiff could return to his past work as a police sergeant or lieutenant.  (ECF No. 14, Plaintiff's Memorandum of Law in Support ("Pl. Mem."), at 15-24.)  The Court first addresses whether the ALJ followed correct legal standards with respect to development of the record, before turning to the ALJ's evaluation of Dr. Goldstein's medical opinion and reliance on the VE's testimony regarding Plaintiff's ability to return to his previous work.

## I. Development of the Record

"Whether the ALJ has met [her] duty to develop the record is a threshold question that must be determined before the Court reviews whether the ALJ's final decision is supported by substantial evidence." *Miranda v. Comm'r of Soc. Sec.*, No. 22-CV-4226 (PKC), 2023 WL 6385727, at *6 (E.D.N.Y. Sept. 29, 2023) (internal quotation marks and citation omitted).  Even when not raised by the claimant, the Court "must independently consider the question of whether the ALJ failed to satisfy [her] duty to develop the Record." *Sanchez v. Saul*, No. 18-CV-12102 (PGG) (DF), 2020 WL 2951884, at *23 (S.D.N.Y. Jan. 13, 2020), *report and recommendation*

15

*adopted*, 2020 WL 1330215 (S.D.N.Y. Mar. 23, 2020) (citation omitted). "[B]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted). "Legal errors regarding the duty to develop the record warrant remand." *Wilson v. Colvin*, 107 F. Supp. 3d 387, 407 (S.D.N.Y. 2015) (collecting cases).

Although Plaintiff has not expressly alleged that the ALJ failed to fully develop the record, this Court is nonetheless obligated to independently assess whether the ALJ properly discharged her duty. The ALJ provided Plaintiff with the opportunity to answer questions regarding his work background and the severity of his alleged impairments at an in-person hearing on November 20, 2017. (Tr. at 538-75.) The ALJ considered numerous physical evaluations, medical records, and other evidence in making her conclusions. (*Id.* at 434-41.) Further, the ALJ reviewed and relied upon the opinions of several medical professional in deciding Plaintiff's RFC. (*Id.*) Where, as here, an ALJ has a "complete record before [her] consisting of medical opinions, treatment notes, and test results . . . the ALJ d[oes] not err in failing to supplement the administrative record." *Schillo v. Kijakazi*, 31 F.4th 64, 76 (2d Cir. 2022). Thus, the

16

Court finds that the ALJ sufficiently developed the record in the instant case.

## II.  The ALJ's Weighing of Medical Opinion Evidence

### a. The Treating Physician Rule

Plaintiff contends that the ALJ failed to give "good reasons" for rejecting Dr. Goldstein's opinion, which he argues should have been given controlling weight.  (Pl. Mem. at 14-21.)  Under the treating physician rule, the opinion of a claimant's treating physician as to "the nature and severity of the [claimant's] impairment is given 'controlling weight' if the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (citing *Burgess*, 537 F.3d at 128; 20 C.F.R. § 404.1527(c)(2)).[2]  An ALJ who does not accord controlling weight to a treating physician's medical opinion must explicitly consider the following non-exclusive *Burgess* factors in determining how much weight to give to the opinion: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether

---

[2] In 2017, new regulations were issued that changed the standard for evaluating medical opinion evidence for claims filed on or after March 27, 2017.  *See* 20 C.F.R. § 404.1520c.  However, because Plaintiff filed his claim on February 17, 2012, the old regulations, including the treating physician rule, still apply.

the physician is a specialist. *Estrella v. Berryhill*, 925 F.3d 90, 95—96 (2d Cir. 2019) (citation omitted); *see also* 20 C.F.R. § 404.1527(c)(2).   "The ALJ must then 'comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion.'" *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) (citing *Burgess*, 537 F.3d at 129).   Though the decision regarding a disability determination is reserved to the Commissioner, "when an ALJ discounts a treating physician's opinion that a claimant is disabled, the ALJ is obligated to give good reasons for doing so." *Quiles v. Saul*, 19-CV-11181 (KNF), 2021 WL 848197, at *9 (S.D.N.Y. Mar. 5, 2021) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).   Further, "[t]he failure to provide 'good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.'" *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129-30).

   **a. Dr. Goldstein's Opinions**

   In the instant case, the ALJ concluded that the 2012 and 2013 opinions of Dr. Goldstein should not be "given significant or controlling weight."   (Tr. at 435.)   The ALJ based this decision primarily on the second and third *Burgess* factors, noting that Dr. Goldstein's opinions "were not supported by the record, which shows that [Plaintiff] received very conservative treatment, including the prescription of Mobic (a nonsteroidal anti-inflammatory drug), but no narcotic pain medication, no surgery, and no injections"

18

and that furthermore "examination findings were mild, including intact strength in all extremities, normal reflexes, and normal sensation." (*Id.*) The ALJ further explained that "[Plaintiff] received no treatment between August 2014 and March 2017 for any orthopedic impairment, except for yoga and chiropractic care." (*Id.*) Earlier in her order, the ALJ noted the length and nature of Dr. Goldstein's treating relationship with Plaintiff, explaining that Plaintiff first sought treatment in December 2011, received follow-up examinations, and that Dr. Goldstein conducted an RFC assessment of Plaintiff in December 2012. (*Id.* at 434.) The ALJ also noted that Dr. Goldstein was a member of an orthopedic practice, Orlin & Cohen Orthopedic Associates. (*Id.*)

Regarding Dr. Goldstein's later August 2017 medical opinion, the ALJ assigned it "less weight." (*Id.* at 437.) In assigning less weight to Dr. Goldstein's 2017 opinion, the ALJ noted that "Dr. Goldstein did not see [Plaintiff] from August 2014 until April 2017" and that the 2017 opinion "appears to have been based primarily on the medical record after the expiration of [Plaintiff's] disability insured status [on December 31, 2016]." (*Id.*)

Plaintiff argues that Dr. Goldstein's medical opinions were not inconsistent with other medical evidence of record, including Dr. Skeene's examination finding a limited range of motion of the lumbar spine and assessing a "moderate" limitation on prolonged

19

standing, walking, and heavy lifting. (Pl. Mem. at 17-18.) Plaintiff fails to directly confront the contrary evidence in the record cited by the ALJ, however, and as such, the Court does not find his argument persuasive.

Though a conservative course of treatment alone cannot justify assigning less than controlling weight to a treating physician's opinion, an ALJ may examine a disability claimant's level of care to determine whether the opinion is consistent with substantial evidence in the record and is, thus, entitled to controlling weight. *See, e.g., Botta v. Colvin*, 669 F. App'x 583, 584 (2d Cir. 2016) (summary order) (rejecting claimant's argument that the ALJ failed to assign sufficient weight to the treating physician's opinion where the relatively conservative treatment of plaintiff's physical impairments was inconsistent with the treating physician's opinion). According to Dr. Goldstein's original 2012 opinion, Plaintiff was unable to sit for more than 4 hours during an 8-hour workday, precluding even sedentary work. (Tr. at 310-11.) Dr. Goldstein's August 2017 opinion imposed further restrictions, limiting Plaintiff to less than 2 hours of sitting during an 8-hour workday. (*Id.* at 815.) As observed by the ALJ, Plaintiff's conservative treatment was entirely inconsistent with Dr. Goldstein's extreme assessment of Plaintiff's limitations.

Plaintiff appears to have received essentially no treatment for his back or neck impairments between August 2014 and March 2017, with the exception of visits to a chiropractor and yoga with his sister. (*Id.* at 435, 829.) Combined with the relatively conservative treatment prior to August 2014, consisting of quarterly follow-up visits, no injections, and only limited pain management, it was reasonable for the ALJ to find that such limited treatment was inconsistent with an opinion finding Plaintiff "[t]otally [d]isabled and unable to perform all aspects of work." (*Id.* at 311, 435.)

Furthermore, the Court does not agree with Plaintiff that consulting examiner Dr. Skeene's examination findings support Dr. Goldstein's opinion. Dr. Skeene observed that Plaintiff was "in no acute distress," his gait was normal, he could "walk on heels and toes without difficulty," he could squat with a full range of motion, used no assistive device to ambulate, and needed "no help changing for the exam or getting on and off exam table." (*Id.* at 288.) Dr. Skeene did assess a slightly limited range of motion of the lumbar spine, but concluded only that Plaintiff would have a "moderate limitation for prolonged standing, walking, and heavy lifting" as a result. (*Id.* at 289-90.) Notably, Dr. Skeene assessed no limitation whatsoever to sitting, as compared to Dr. Goldstein's assessment that Plaintiff was unable to sit for more than 4 (or later, 2) hours in an 8-hour workday, and assessed only

a limitation to "heavy" lifting, as compared to Dr. Goldstein, who opined that Plaintiff could lift "less than 5 lbs"[3] for 2/3 of an 8-hour workday, and "less than 10 lbs" for 1/3 of an 8-hour workday. (*Id.* at 289-90, 310-11, 815.) Although both Drs. Skeene and Goldstein observed that Plaintiff had limited range of motion in his lumbar spine, such a finding in and of itself does not appear to support the extreme limitations suggested in Dr. Goldstein's opinion in light of the dramatically different conclusions the two physicians reached.

Plaintiff also does not address the internal inconsistencies between Dr. Goldstein's observations while treating Plaintiff and his ultimate opinion regarding disability. As noted by the ALJ, during each of his visits, Dr. Goldstein assessed Plaintiff as having "intact strength in all extremities, normal reflexes, and normal sensation." (*Id.* at 284, 286, 314, 317, 435, 835). "Given the inconsistencies here, the ALJ was free to discount [the treating physician's] opinions in favor of a broader view of the medical evidence, notwithstanding [Goldstein's] status as the 'treating physician.'" *Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008) (summary order).

---

[3] The Court notes that Dr. Goldstein's subsequent August 2017 medical opinion is less restrictive than his 2012 opinion, opining that Plaintiff could lift or carry "more than 5 lbs, but less than 10 lbs" for a total up to 2/3 of an 8-hour workday, as opposed to "less than 5 lbs" in 2012. (Tr. at 310, 815.)

Regarding Dr. Goldstein's 2017 opinion in particular, the ALJ properly assigned it "less weight" given it appeared primarily to have been based on the medical record after Plaintiff's date last insured.  (Tr. at 437.)  Such an analysis was not improper, as "a physician's opinion may potentially be entitled to less weight if the examination occurred after the date last insured and no connection is made between the recent diagnosis and plaintiff's condition during the date last insured." *McAllister v. Colvin*, 205 F. Supp. 3d 314, 332 (E.D.N.Y. 2016) (citing *Vilardi v. Astrue*, 447 F. App'x 271, 272 (2d Cir. 2012) (summary order) (finding plaintiff's reliance on medical evidence demonstrating a worsening of her condition after the date last insured was of "little value")).

When discussing the good reasons for not giving controlling weight to a treating physician's opinion, an ALJ is not required to explicitly go through each of the factors in her decision, but her rationale and adherence to the regulation must be clear.  *See Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004) (per curiam) (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed.").  Though the ALJ devoted most of her analysis to the second and third factors – supportability and consistency – she was clearly aware of Dr. Goldstein's status as a member of a practice devoted solely to

23

orthopedic medicine, (Tr. at 434), and she also acknowledges the length and nature of the treating relationship between Plaintiff and Dr. Goldstein, (*id.* at 434-37).  After a careful review of the record, the Court finds that the ALJ adequately explained her rationale, complied with the requirements of § 416.927(c), and correctly applied the treating physician rule when she decided to attribute little weight to Dr. Goldstein's opinions.

### b. Drs. Schosheim's and Galst's Opinions

Plaintiff also argues that the August 2017 opinions of non-examining physicians Drs. Schosheim and Galst "cannot constitute substantial evidence to override a treating source opinion." (Pl. Mem. at 18.)  In further support of this argument, Plaintiff states that "neither medical advisor considered [Plaintiff's] complete medical file." (*Id.* at 20.)

As an initial matter, "[a]n ALJ is entitled to rely on the opinions of *both examining and non-examining State agency medical consultants*, because those consultants are deemed to be qualified experts in the field of social security disability." *Angela H.-M. v. Comm'r of Soc. Sec.*, 631 F. Supp. 3d 1, 9 (W.D.N.Y. 2022) (citation omitted, emphasis in original).  "Although an examining source is generally afforded more weight than a non-examining source, an ALJ is allowed to afford a non-examining source more weight than an examining one." *Id.* (internal quotation marks and citation omitted); *see also Camille v. Colvin*, 652 F. App'x 25, 28

24

(2d Cir. 2016) (summary order) (noting that an ALJ is permitted to conclude that a consulting physician's opinion is more reliable than that of the treating physician). The ALJ erroneously stated in her decision that Dr. Schosheim "reported he had treated [Plaintiff]" from April 2011 to January 2013, but did not assign the opinion controlling weight or otherwise appear to consider him a treating physician in weighing the opinion evidence. (Tr. at 436-37.)

Regarding Plaintiff's second contention, Plaintiff is correct that courts have found remand appropriate when an ALJ relies on the opinion of a non-examining physician who assessed a claimant "without reviewing the complete record of [the claimant's] medical history." *Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 200 (2d Cir. 2010) (summary order). Remand was appropriate in those circumstances because the Second Circuit found that consideration of the additional evidence in question "might have altered [the non-examining physician's] conclusions." *Id; see also Hidalgo v. Bowen,* 822 F.2d 294, 298 (2d Cir. 1987) ("One lengthy record exhibit not available to [the non-examining Physician] at the time of the hearing contained clinical findings confirming the treating physician's diagnosis; this may have altered [the non-examining physician's] conclusions."). Thus, it is not enough for Plaintiff to simply note that the non-examining physicians failed to review

certain evidence – he must also explain how that evidence might have altered their conclusions.

Plaintiff argues that neither Dr. Galst nor Dr. Schosheim reviewed "the evidence from Tr. 799-847," that Dr. Schosheim specifically "did not review the April 2017 MRI of the lumbar spine," and that Dr. Galst specifically "did not review the August 2016 myocardial perfusion scan demonstrating a small area of mild ischemia."[4]   (Pl. Mem. at 20.)   After reviewing the records from pages 799 through 847 of the Administrative Transcript and the August 2016 scan, the Court finds that the records would not have altered the physicians' conclusions.   The pages referenced from the transcript include (1) two coronary reports from Good Samaritan hospital, (Tr. at 799-801), that were previously summarized in Exhibit 21F, (*id.* at 360); (2) a February 2013 radiology report showing a "linear atelectatic versus fibrotic change at left base" in Plaintiff's lungs (*id.* at 802); (3) an August 2016 echocardiogram report (*id.* at 803-04); (4) exercise stress test reports from August 2016 and April 2011 (*id.* at 805-06); (5) an August 2016 myocardial perfusion scan report (*id.* at 807); (6) the

---

[4] The Court notes that both Dr. Schosheim and Dr. Galst provided their opinions in the form of responses to a "medical interrogatory" following the remand of Plaintiff's case.   (Tr. at 776-93.)   The Doctors' opinions are dated August 1, 2017, and August 7, 2017, respectively, and the evidence to which Plaintiff refers, submitted post-remand, appears to have been received by the SSA on dates between September and October 2017, after the doctor's opinions had already been completed.   (*Id.* at 776-847 (medical records are stamped with a "received time" date in the bottom left corner).)

results of an April 2017 lumbar MRI (*id.* at 808-09); (7) a May 2017 nerve conduction study (*id.* at 810-12); (8) an August 2017 right shoulder MRI (*id.* at 813-14); (9) Dr. Goldstein's August 2017 medical opinion (*id.* at 815-20); (10) Dr. Goldstein's treatment notes from April through August 2017 (*id.* at 821-28); (11) orthopedic treatment notes from March 2017 (*id.* at 829-32); (12) orthopedic treatment notes from August 2014 (*id.* at 833-35); (13) August 2016 and 2017 cardiovascular exams (*id.* at 836-39); and (14) an October 2017 medical opinion from Dr. Kevin Weiner along with April through July 2017 treatment notes from the same doctor (*id.* at 840-847).

First, the Court notes that the vast majority of the records referenced by Plaintiff post-date the relevant time period. "[F]or these records to provide substantial evidence of a disability during the relevant time period, the records must actually shed light on [Plaintiff's] condition during that period." *Clark v. Saul*, 444 F. Supp. 3d 607, 621 (S.D.N.Y. 2020) (citing *Flanigan v. Colvin*, 21 F. Supp. 3d 285, 302 (S.D.N.Y. 2014) (denying benefits where "at best the evidence show[ed] that [the plaintiff] experienced progressively worsening symptoms that eventually became disabling" after his date last insured)). Thus, to the extent the non-examining physicians were without the benefit of treatment records that postdate the date last insured, the Court

is not convinced that such records would have altered their conclusions.

Second, regarding the August 2016 myocardial perfusion scan, the Court notes that the findings and conclusions are nearly identical to the other myocardial perfusion scan in the record from June 2011, also conducted at St. Francis Hospital. (Tr. at 370, 807.) Both found "[a] small area of mild ischemia" and "ejection fraction is greater than 70%." (*Id.*) Furthermore, the ALJ questioned Plaintiff regarding the August 2016 scan in question during the hearing, and Plaintiff claimed that his heart issues did not prevent him from working:

> [The ALJ]: Okay. I mean, last testing I see Dr. Reich, August of '16, says your ejection traction is greater than 70 percent. Is there anything? Okay, so was that -- does that continue to be an issue that stops you from being able to work?
> [Plaintiff]: No, ma'am.
> [The ALJ]: Your heart?
> [Plaintiff]: No, ma'am.
> [The ALJ]: Okay. So I'm, I'm specifically concerned with your orthopedic complaints because we're talking about your treatment with Dr. Goldstein and then your counsel can, can ask you about, you know, any other complaints that you have and that he wants to cover here today.

(*Id.* at 546.) As such, given the findings appear to have mirrored the earlier June 2011 myocardial perfusion scan, and given Plaintiff's testimony that his heart conditions did not stop him from being able to work, the Court is not persuaded by Plaintiff's argument that Dr. Galst's failure to reference the August 2016 scan means the ALJ could not have relied on his opinion.

Third, regarding the April 2017 MRI, the Court notes that the evidence is from after the date last insured of December 31, 2016. Given the non-examining physician already had the benefit of an earlier lumbar MRI from within the relevant period which also showed disc herniation, (*id.* at 318), the Court is not convinced that Dr. Schosheim's conclusions would have been altered in the presence of the additional evidence.

Finally, the Court notes that even if the opinions of Drs. Galst and Schosheim were deficient for failure to consider the more recent medical evidence just discussed, the ALJ also based her RFC on the medical opinion of Dr. Skeene, who did conduct a physical examination of Plaintiff. (*Id.* at 287-90.) Dr. Skeene opined that Plaintiff had a "moderate limitation for prolonged standing, walking, and heavy lifting," and the ALJ accorded the opinion "some weight, but not great weight." (*Id.* at 290, 440.) Other Courts in the Second Circuit "have consistently found that moderate limitations in a plaintiff's ability to perform exertional activities are consistent with an RFC for light work." *Dillon v. Kijakazi*, No. 21-CV-07398 (VF), 2023 WL 6316422, at *10 (S.D.N.Y. Sept. 28, 2023) (citing *Ruiz v. Comm'r of Soc. Sec.*, 625 F. Supp. 3d 258, 268 (S.D.N.Y. 2022)); *see also White v. Berryhill*, 753 F. App'x 80, 82 (2d Cir. 2019) (summary order) (consultative physician's opinion that plaintiff had moderate limitations in standing, sitting, and performing "other activities" supported RFC

for light work).  Thus, even in the absence of the opinions of Drs. Galst and Schosheim, the Court finds that the ALJ's RFC determination was based upon substantial evidence.

For the foregoing reasons, the Court finds that the ALJ weighed the opinion evidence in accordance with applicable regulations, and that her RFC determination was based upon substantial evidence.  Having determined that the ALJ properly considered the medical opinion evidence before her and considering the "very deferential standard of review" in Social Security cases, the Court declines to disturb the ALJ's findings, which are supported by substantial evidence.  *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012).

## III. ALJ's Finding that Plaintiff Could Perform His Past Work

Plaintiff argues that the ALJ failed to establish that Plaintiff could return to his past work, in part because the ALJ "failed to meaningfully address the August 11, 2011 determination" from the NYPD that Plaintiff could no longer perform the "full duties" of an NYPD officer.  (Pl. Mem. at 21.)  Plaintiff also argues that the "vocational expert's testimony conflicts with the Dictionary of Occupational Titles ('DOT')" regarding the job of a police lieutenant and sergeant, and Plaintiff's ability to return to his past work.  (*Id.* at 22.)

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to

30

support the assumptions upon which the vocational expert based his opinion, and [the hypothetical] accurately reflect[s] the limitations and capabilities of the claimant involved." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (internal quotation marks and citation omitted).  The Second Circuit has held that "in the fourth stage of the SSI inquiry, the claimant has the burden to show an inability to return to [his or her] previous specific job *and* an inability to perform [his or her] past relevant work generally." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (citation omitted, emphasis in original).  "This inquiry requires separate evaluations of the previous specific job and the job as it is generally performed." *Id.*  "Many specific jobs differ from those jobs as they are generally performed, and the expert may identify those unique aspects without contradicting the Dictionary [of Occupational Titles]." *Id.*

First, the Court finds that the ALJ did not improperly disregard the NYPD's decision that Plaintiff was entitled to Accident Disability Retirement based on his coronary artery disease.  "A determination made by another agency regarding a claimant's disability is not binding on the Social Security Administration." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing 20 C.F.R. § 404.1504).  "Nonetheless, it is entitled to some weight and should be considered." *Id.* (internal quotation marks and citation omitted).  As it is written,

Plaintiff's disability determination from the NYPD refers *only* to his heart disease, and not to any back pain or any other issues. (Tr. at 304-06.)  As discussed *supra,* Plaintiff testified during the hearing before the ALJ that his heart conditions no longer preclude him from being able to work.  (*Id.* at 546.)  The ALJ referenced and considered the NYPD's disability determination in her RFC determination, but granted no weight to its conclusion regarding disability.  (*Id.* at 438.)  Given the record, the Court finds no error in the ALJ's dismissal of the NYPD's disability determination.

Second, the ALJ properly determined that Plaintiff was able to perform his past work by relying on the VE's testimony.  During Plaintiff's questioning by the ALJ, he testified that his work as a police sergeant differed from being a patrol office as it was "[m]ore administrative work" and involved supervising officers in the field and at the "station house."  (*Id.* at 544-45.)  Likewise, Plaintiff further explained that his work as a police lieutenant was "[m]ore desk supervisory" and agreed that it was primarily a "desk-type job."  (*Id.*)  Upon the conclusion of Plaintiff's questioning by the ALJ and his attorney, the VE asked for additional information regarding "the actual duties" Plaintiff had as a police lieutenant.  (*Id.* at 567.)  Following additional clarification from Plaintiff, the VE asked additional follow-up questions regarding the specifics of Plaintiff's work.  (*Id.* at

568-69.)  The ALJ subsequently provided the VE with a hypothetical which accurately described Plaintiff's RFC, and asked the VE if such an individual could perform Plaintiff's past work.  (*Id.* at 570.)  The VE stated that such an individual could not perform work as a "police officer" or as a "patrol officer" but could perform his past work of a police lieutenant or sergeant, which were both classified as "light" work.  (*Id.* at 569-70.)

Plaintiff argues that, based on the DOT descriptions, the job of a police lieutenant requires crawling, and that the job of a police sergeant requires "frequent" exposure to weather, both of which conflict with the RFC described by the ALJ in her hypothetical.  (Pl. Mem. at 23.)  Plaintiff further argues that both jobs would require more standing and walking than Plaintiff's RFC allowed.  (*Id.* at 22.)  The ALJ noted in her decision, however, that Plaintiff "testified that his work as a police sergeant and police lieutenant were primarily desk jobs" and that as a result "the record does not establish that [Plaintiff] had limitations that would preclude him from performing his past relevant work" during the relevant period.  (Tr. at 441.)  Plaintiff never described needing to crawl in his testimony regarding his past work as a Police Lieutenant, and likewise did not describe his work as a Police Sergeant as involving "frequent" exposure to the elements.  (*See generally id.* at 544-70.)  Plaintiff's hearing testimony supports the ALJ's conclusion that the police sergeant

33

and lieutenant position as Plaintiff performed it were consistent with his RFC. *See Ramos v. Berryhill*, 395 F. Supp. 3d 329, 342 (S.D.N.Y. 2019) (ALJ did not err in finding that plaintiff with sedentary RFC could return to past work as a corrections officer, notwithstanding the DOT's classification of the job as medium work, given his testimony describing his past work as "primarily a desk job"). The Plaintiff has the burden to show an inability to return to his previous work as *he* performed it, and not just as it is customarily performed throughout the economy, which he has failed to do. *See Jasinski*, 341 F.3d at 185. As a result, the ALJ committed no error in her Step Four analysis.

Finally, even if the ALJ erred at Step Four, her error would be harmless and would not warrant remand. After the VE testified that Plaintiff could perform his past work as a police lieutenant or sergeant, the ALJ asked if there are "other jobs in the national economy that such a hypothetical individual could perform." (Tr. at 571.) The VE testified that there were, including police aide, clerical assistant, and customer service representative.[5] (*Id.*) The ALJ noted these findings in her decision and stated that the VE "found that an individual with the same medical vocational profile as the claimant could perform" other work in the national economy. (*Id.* at 441.) Plaintiff points to no error in this

---

[5] The VE classified police aide and customer service representative as being "sedentary" roles and clerical assistant as being "light" work. (Tr. at 571.)

determination or reliance on the VE's testimony, given the ALJ was not required to perform a transferable skills analysis as Plaintiff was not "of advanced age." *See* 20 CFR § 404.1568(d)(4); *see also McDonaugh v. Astrue*, 672 F. Supp. 2d 542, 566–67 (S.D.N.Y. 2009) ("the regulations only state that a lack of transferable skills may rule out light or sedentary work for individuals age 55 or older"). Therefore, because the ALJ's alternative Step Five analysis was proper, a different outcome at Step Four would do nothing to change the overall result. *Roman Jimenez v. Colvin*, No. 12-CV-6001 (PGG) (FM), 2014 WL 572721, at *17 (S.D.N.Y. Feb. 13, 2014), *report and recommendation adopted sub nom. Jimenez v. Colvin*, 2016 WL 5660322 (S.D.N.Y. Sept. 30, 2016) (finding error at step four harmless in light of alternative step five determination).

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is **DENIED,** and Defendant's motion for judgment on the pleadings is **GRANTED.** The Clerk of Court is respectfully directed to amend the caption to reflect the new Commissioner, enter judgment in favor of the Commissioner and close this case.

**SO ORDERED.**

DATED:   March 11, 2024
         Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge